In our third case, number 23, 1393, Craven v. Novelli, et al. Mr. Heroy? Yes, good morning, Your Honor. Good to have you with us. Thank you. My name is Alex Heroy, and I represent the appellant Amy Craven on behalf of the estate of Christopher Craven, her deceased husband. With me is Preston Notum, and Ms. Craven is in the back of the courtroom this morning as well. We appeal the district court's grant of summary judgment in this matter because the district court improperly apprised the summary judgment standard and gave credit to the defendant's contentions of the evidence and disregarded the plaintiff's evidence in this case. The district court, in its findings of fact, or it's in its factual recitation, found three dispositive facts. One is that Craven brought his hands to his waist and reached towards his waist. Second, that Craven's right hand moved faster than his left hand when it went down. And third, based on Arndt and Novelli's testimony, that Craven pulled a firearm and brought it to his waist. The district court then found the shooting of Craven to be objectionable and reasonable because, one, Craven assaulted his wife. Two, Craven was unstable, agitated, and suicidal. Three, he was armed with a firearm. And four, after being told to raise his hands, he lowered them towards his waistband. The plaintiff presents diametrically opposed evidence to the defendants in this case. The plaintiff's view of the evidence is you have a domestic disturbance coupled with a mental health crisis. That is not disputed as a mental health crisis. Craven is suicidal. By the time the officers arrive, Craven is on his front stoop smoking a cigarette. The officers set up a couple houses down, no blue lights, no warning at all. They cross the neighbor's yard with their long guns. And as they approach, and if you watch the video — What kind of guns do they have that they carry with them? Pardon me? What type of guns? You all talk about rifles and long guns. I'm not an arms expert, so I don't know, but these are — I'm not either. You say in your brief that they shot him 20 times in four seconds or something. I just wondered what kind of firearms. I think they're semi-automatic rifles. The specific number, I don't know. I believe so. But you don't know anything beyond that? I do not, Your Honor. Okay. And then as they approach, and if you turn the volume up to the video very loudly, we believe that Craven, as the officers approach, say, Y'all know you don't have to shoot me. Or y'all know you don't have to do this. And we listened to it probably 50 times. You have to turn the volume up as loud as it possibly can go. But it says, Chris says, Y'all know you don't have to do this. And the very next thing is Officer Arndt stating, Police Department, get up your effing hands. Chris puts his hands up, and then he says, Show me your hands. And Chris complies. He shows his hands. And then as Chris is starting to go down, Officer Arndt says, Get on the effing ground. And then after that, Chris got on the ground because they shot and killed him. You just said as Chris was starting to go down, and you moved your hands down. Correct. So are you conceding that he did move his hands down? Correct. Yes, he does. We do believe that it is him. And the officers were advised that he had a firearm. Correct. Okay. Correct. But under the cases that this court has written or certainly joined, possession of a firearm in your own home is not unlawful. Disobeying an officer's commands. Unless officers are responding to a domestic violence situation where there's a mental health crisis going on, that sort of changes the mindset of the responding officers, doesn't it? Well, like in Hensley, the domestic assault in that case had ended. In this case, the alleged domestic assault had ended by the time the officers arrived. Chris is on the front porch smoking a cigarette. He's away from his wife and children. But this is about the threat to the officers, isn't it? Yes. I think the trouble for you, and I'd like to hear you distinguish, is Anderson and Slattery, right, where when the officers have reason to think a person has a gun and they say, you know, hands in the air, show me your hands, and then the person drops their hands, you know, anywhere down towards where the gun might be. We've said that officers have reason to think that they're in imminent harm, imminent, you know, deadly harm. How do you distinguish that? Well, Chris complied with the officer. The command was, show me your hands. He showed his hands. There's nothing to say I have to keep my hands from Officer Arndt. That didn't shoot him for disobeying. It's the threat. It's the threat of dropping the hands to where the gun is. So how do we distinguish that? You're saying they couldn't draw their weapons. But we've said in previous cases where someone dropped his hands to get his Walkman. They thought it was a gun, but it turns out it was a Walkman. Right? That that was still not excessive use of force because the officers thought that a gun was going to be used. Absolutely. Those cases, the individual moves his hands towards the bulge or towards away from the officer's view. In this case, Chris is complying with the officer's command, show my hands, and we contend that he doesn't move them towards his waistband. And that's why I believe the district court erred is because he says he reached towards them. We can see in the video he drops them down. And he maybe gets to hear before the command is get on the effing ground. And so he's then perfectly entitled to keep going. I could watch the video. I mean, I know when they said get on the ground and where his hands were at that point, and I disagree with you there, but we understand that we have to take the facts that aren't disproved by the video in the light most favorable to you. But I'm still wondering, when hands move from, when they say hands up and hands move down towards the gun, what else is there? And are any of these other facts even relevant? I mean, I think the fact that they have to say that the arms moving down is a threatening behavior. And if they're saying, one, get on the ground, I would propose that it's not threatening. But also, in the video of what we can see, his arms stay out the whole time we can see him. We never see them go down to his waist. What did the officers say they saw? The officers state that they saw him pull a weapon. And do you see anything to the contrary in the video? That Chris is walking in a nonthreatening manner in front of his house. Do you see anything to the contrary in the video? You don't, because there's a bright flash of light, right? You see his hands go down, bright flash of light, and there's nothing to contradict what the officers say. Yes, because Chris is dead at this point, and we can't have it. So what we can see is to about here, and then we can't see anything else. There's also a reflection on the white truck, which is hard to discern, but you never see, if you rewatch it, there's a white truck in the front, and there's a reflection on it. And it shows, because it's not obscured by the white light, you can see a little bit more, and if you watch it again many, many times, we believe that it shows that Chris's hands never go towards his waistband, and they're out in front of him at the time the shooting occurs. So that is what we say the evidence is in the case, is that the video does not support. So the officers had to wait until his hands got all the way to his waistband? The officer has to wait until he makes a threatening move towards his waistband. If his arms are out in front of him, we would propose that's not a threatening move at all. They're still away from the gun. They're moving down. What's that? His arms were moving from up to down, and down is in what direction? It is toward his waistband. It is, but he has to be going. How is that not a threatening move? Because he's not reaching for the waistband. His arms are still out. That goes back to Judge Washington's question. How close does he have to get to pulling the gun on him? In this scenario, when they're arriving at what they are aware was a dangerous situation, domestic situation, with a mental health crisis and somebody that has a weapon? He has to move forward. And if they say get on the ground and he's going to lay down and put his arms out, he's still getting close to the weapon, but he's not made a threatening move towards the weapon. And so that's the officer's position. But we propose the video does not show him make any threatening move whatsoever. His gait doesn't change. He has a cigarette in his mouth. He doesn't say anything threatening. So to go from this position where he says, y'all know you don't have to do this, he complies and then to immediately shoot him. We say the evidence doesn't support whatsoever that he made any threatening move whatsoever towards these officers. Quite the contrary. He complies with them. He tells them you don't have to do this. If he made a threatening move, is that enough? If he made a threatening move towards his firearm. If he made a threatening move, is that enough for them to fire? If a jury were to believe the defendants. Answer my question, yes or no. If he made a threatening move, is that enough for them to fire their weapons? If he made a threatening move towards his firearm, yes. Does it make a difference whether they fired once or 20 times? At some point I think you'd say it's excessive, but in this case I think we can't, because of the number of shots, you can't say, well, he wouldn't have died after 20. What do you think about the fact that he shot him 20 times? You're saying the fact that he shot him is enough? Correct, Your Honor. There's no question he shot him, but you don't say that 20 times shows this was wrong? I absolutely think it shows it's wrong, but I don't think that we could argue to a jury that it's shots, you know, 12 and 13 were too much and he would have lived, but for the first, you know, the 11 shots were nonfatal, but then it's 12 and 13. I don't think we can. There were 20 from two weapons. Correct, Your Honor. Towards the house with them. You said in your brief that they fired, hit him 20 times and fired several times, additional times that hit the house or something, doors and stuff. Correct, Your Honor. Well, how many times did they fire? I don't know the exact number. It sounds like a war is going on over there. Exactly. And at least 15 of them struck Chris's body in the numerous. You said 20 in your brief. I think there's two different autopsies. I thought you were leveling with the 20. We rely on the lawyers. Now you're saying 15. I think there are two different autopsies. One autopsy says 15 and one says 20. Okay. And then there are numerous bullets that hit the house with the wife and children in it. Some of them actually pierced the house. One of them hits a fire extinguisher. You're saying there were additional ones that hit the house. Yes, Your Honor. So I think going back to the diametric opposed facts, and these cases all come down to the facts. Every single one is very fact-intensive inquiry. And so if you believe the plaintiff's case is you have an individual at his home. They were out there because they got a call that basically said the man wants to commit suicide. Correct. And this court has drawn a distinguishment between suicide and homicidal. He's not homicidal at all. He's suicidal. Previous, but then at least the threat of assault has abated when he's outside on his front porch. He's calmly walking towards the officers. He says, no, you don't have to do this. He complies. He puts his hands up. And maybe he's just getting down to just have a conversation about this. Maybe he's calmed down. We don't know whatsoever. The only— His moves what caused them to react. But he— His move with the hands caused them to react. But unconstitutionally so. We would contend. That's the question. That's the question. And that's what we would contend. And you have to—and the district court believed the defendant's version of events here and supplanted those when you can't see. Once the video becomes unreliable, there's lots of things. I think we can all agree there's lots you can't see in the video. But the district court then says, well, let me fill in those holes with the defendant's version of events and doesn't give credit at all to the plaintiffs. You have to have evidence that contradicts that. The court can't grant summary judgment if there's disputing evidence. But if one side presents evidence on a point and the other side just says, well, no, we don't believe that, but they don't have evidence, the court can say the undisputed evidence shows what one side says it does. Well, a couple points on that. One is Chris says, y'all know you don't have to do this, and not in a threatening way with a calm voice. Second, he's compliant with the officer's commands to put his arms up. And then to show his hands. And I think that's a very important point. It says show his hands. It's not keep your arms up. We know that from the video and from the officer's testimony. Yes, yes. The daughter and the wife don't tap us any. They're inside and they don't see anything. And then literally, though, as quickly as he raises his hands, he drops them down. They're not up for any amount. I mean, it's like a second. And then he's down, moving. They say show his hands. Toward the waistband direction. And he complies. They say show his hands and he complies and continues to walk. Not in an aggressive manner. He doesn't turn toward them. So it's kind of, he's not walking towards Officer Arndt who fires the shots or Officer Novelli who shoots. He's walking, I think. Walking toward an officer. I think Glenn is in that general direction. That others shot in defense of that officer. But I don't, I mean, Glenn doesn't say that. And he's over there and he doesn't see anything. So he's not to the point that we can say that. And neither Novelli or Arndt know exactly where Glenn is at that point. So they don't say that. They don't say we're shooting because we thought he was going to shoot Glenn. Chris never rotates his position. We never see his arms go to his waist. Which I think is important. Or move in a threatening manner. We never see any of his actions change. He just continues going forward like, you know, at casual pace. Doesn't say anything. And that's it. And so they just say that because, they then fill in the blanks and say, well, Chris pulled a gun. And that's it. And now we get to shoot him. Which, of course, if Chris did, then they could shoot him. But that's not supported by the evidence in this case. No, they don't have to wait for him to actually get his hands on the gun. I agree. Okay. I agree with that. But he has to make a threatening movement. And we contend that he does not. And the only way that the district court found that is by crediting the officer's testimony. And did not look at any other theory. A reasonable jury could say that going like this was not a threatening behavior. It looked at the video. That's a jury question. It looked at the video. Judge Bell? The court looked at the videos. Yes, Your Honor. Yes, Your Honor. Your time is up. Thank you, Your Honor. Thank you very much. Does my colleagues have a further question? No, thanks. You've saved some time. Now, we've got Mr. Stewart. Yes, Your Honor. Mr. Stewart, good to have you with us. Thank you, Your Honor. May it please the court, my name is Jake Stewart. I'm here on behalf of the defendants, the town of Mooresville, and the officers Novelli and Arndt. We believe that the decision issued by Judge Bell in the district court to grant summary judgment and dismiss these claims was correct and should be upheld. Why did they have to shoot him 20 times? Well, Your Honor, officers are trained to shoot until the threat is no longer present. And that's what these officers testified to, that they shot until they felt the threat was no longer present. And there is case law, the Elliott v. Levin case, Your Honor, that says that the number of shots fired, it's not of a bearing on whether or not it's an excessive force claim or a violation of constitutional rights. So I think in this case, while it seems like a lot of shots, it all happened in a span of about two or three seconds. And they fired until the threat was no longer present, until Mr. Craven was on the ground. What they testified to is that he continued to move, and they didn't know whether or not they were hitting him. What types of weapons were these, anyway? I'm sorry, Your Honor? What types of guns were these? They were semi-automatic rifles. I don't know exactly what kinds. Semi-automatic? Semi-automatic. All weapons? That's correct, Your Honor. So they would pull the trigger individual times for each round. Every time you pull it, it keeps firing? Correct, Your Honor. That's correct. Like an M16? Sorry to clarify, it doesn't keep firing, does it? You have to pull the trigger each time to get a bullet? Each time they pull the trigger, one bullet is fired. Right. If you hold down the trigger, it doesn't keep firing. That is correct. Okay, thanks. That's right. They're not automatic weapons. They are not automatic weapons. They were semi-automatic weapons. The interaction between Officers Novelli and Arndt and Mr. Craven lasted mere seconds. And in those few seconds, these officers had to weigh the danger that they faced, the stress of the situation, and all the circumstances that had kind of unfolded that evening. As you all know, and as the case law says, the right to use force, the justification to use force, can appear and disappear in a split second. And it's in that split second that the officer has to decide whether or not the use of force is appropriate. Here these officers testified that Mr. Craven pulled a weapon from a holster in his waistband when they told him to show his hands. And that's why they used force. Can you distinguish this case from our Ailman case that was a 2023 case where the individual had his hands up and was shot, and we said that's not okay? I can, Your Honor. In the Ailman case, at least the way I read it, one of the big issues was the language barrier. These officers responded to a call where there are a number of distinctions, and I'm going to kind of go through and address them all. First of all, in the Ailman case, Mr. Ailman, or I'm sorry, the individual that was shot was the one who called for help. He said, I need help. I would like the officers to come and assist me, and I've got a gun. And they came in fully aware of what they were dealing with. In this case, we've got a daughter calling indicating that her father had hit her mother, had a weapon, was threatening to harm himself. So just the call itself was a little bit different. The information the officers had was different. When they actually approached the individual in the Ailman case, they'd initially given Spanish instructions to show his hands because they knew the individual only spoke Spanish. And he did initially, and his hands came up. And then they noticed he had a gun in his hand, and they started giving English commands. And it seemed, at least from my viewing of the record, it seemed that the suspect was confused and didn't know how to react. There was also a dispute of evidence as to whether or not the gun was pointed at the officers. There were some credibility concerns. Here, there is no such dispute of evidence. As Judge Rushing noted, we've got evidence from the officers testifying that Mr. Craven pulled a weapon on them when he was asked to raise his hands. We've got the video footage, which corroborates and is consistent with that testimony from the officers. And there's absolutely no evidence that contradicts or disputes what those officers testified to. The only evidence in this case is that Mr. Craven was asked to raise his hands. He complied with that request, and then he reached towards his weapon. Another distinction, I thought an ailment. He had the gun in his hand, but our court said he was shot while his hands were raised in a position of surrender. That's right, Your Honor. Is that what happened here? That is not what happened here, and there's no evidence that that's what happened here. As it can be seen, and the body camera footage corroborates this, the officer testimony, his hands clearly come down, and we never see his hands come back up. And we can see his head through the whole video. It's kind of whitewashed from the chest down, but we can see above, so we would have known if his hands came back up, and they didn't. His hands were clearly— Well, I mean, opposing counsel, in all fairness, would say they didn't come back up because he was shot pretty quickly 20 times. Couldn't really raise his hands back up. I agree, Your Honor, and I was just addressing the question as to whether or not his hands were raised in an upward position when he was shot. And I think the evidence is clear here that he was not. Now, what happened when his hands came down, the only evidence is that he was reaching for a firearm, and he began to produce that firearm, and that's when shots were fired. And I think this body camera footage is wholly consistent— He was reaching towards your left side. I thought his holster was on the right-hand side. That's right, Your Honor. His holster is on his right-hand side. That was— I remember with the holster, he had the holster on, and the firearm was back up on the porch or something. It was. Yep. You could see the officers come up, and the first thing Officer Arndt says is, where's the gun? And he pans to the right, and you see the gun laying kind of on a step on the porch right next to Mr. Craven. Now, when I watched that video, I don't see the gun sitting there before Mr. Craven comes out. The only time I see the gun sitting there is after the shooting occurs, which I think also supports the testimony that he began to pull that gun out when they started firing at him, and it must have flown from his hand and landed there on that step when they approached. That's your theory? Well, that's my theory consistent with the evidence, consistent with the body camera footage, consistent with the testimony. You didn't reach for your left side. I did. His holster was on the right side. That's right, Your Honor. You're reaching the wrong way. I'm reaching the wrong way. I don't own a handgun. I don't have a concealed carry, Your Honor, so I'm not familiar with which side I would reach to. I obviously don't know what I'm doing when it comes to handling weapons, but that's not what we were dealing with in this case. And there is no testimony to the contrary. There's no eyewitnesses. The body camera footage does not dispute what these officers said. What's the evidence of these two officers and the videos? Well, there's the telephone call. There's the telephone call? That's beforehand. That's beforehand, and I think that that helps. So in addressing the Nibs case, which is another— Neither the wife or the daughter saw anything. Correct. Or there were two minor children inside and no one saw anything. That's correct. And to quickly address the issues that this court found in the Nibs case, or maybe not the issues but some of the findings they had, is there was a question as to whether or not the suspect knew or should have known that they were dealing with law enforcement. And we're not dealing with that here. We've got the 911 call where you could hear Mr. Craven say something to the effect of, when the police get here, I'm going to go outside and you're not going to have a father anymore. He is aware that there are police there. The comment that he made to the police as they were approaching, while I would respectfully disagree with plaintiff's counsel, it's difficult for me to understand what is being said by Mr. Craven, but he clearly says something. He knows the police are walking up on him. This isn't a situation where he was ambushed in the dark and he didn't know that they were coming. And the fact that he complied with that first order, they said, police department, show me your hands, and he immediately raises his hands. Any reasonable officer in those officers' shoes would believe that Mr. Craven knew that they were police, knew that he could understand what the commands were given, and that he was attempting, at least initially, to comply with those commands, which makes it even more reasonable that when he then reaches down to what they suspect and believe to be a firearm, that he intended to use that firearm. And as Judge Thacker, as you noted, they don't have to wait for him to grab that firearm and pull it out to see what he's going to do with it. The Nibs case and the Hensley case both state that when an officer approaches a suspect and gives clear, lawful commands, and that suspect knows that it's law enforcement, and in response that person continues moving and makes what's considered a furtive movement towards a suspected weapon, that officer has probable cause to believe that imminent harm is forthcoming. And that's exactly what we're dealing with here. And that's why these officers were justified. It has to be a threatening move. It has to be a furtive move, which has been defined as being threatening. And I think the courts have upheld in Slattery, Anderson, Ruffin, Sigmund, that moving towards, in this case it's frankly more compelling than those, Your Honor, because here we have a gun. In those cases you had a beer bottle, I think a radio or a walkie-talkie, and a nightstick in Ruffin, and here we've got a gun. And the officers knew that Mr. Craven had a gun when they approached him. So to me this fits squarely within those line of cases, but frankly it's more compelling because we have a weapon. And there's no contradicting evidence. The only evidence is kind of what's exactly been in line with Fourth Circuit decision dealing with these issues. And just to quickly address a few other things, and I'm happy to answer any further questions that there may be, there was some mention that him lowering his hands was an attempt to comply with an order to get on the ground. At least in my viewing of the video, it seems that the hands start to come down before any command to get on the ground is given. And while we can't see exactly what his hands do when they come below the waist, what we can see are his feet and his head. His feet don't stop moving, he continues to walk, and his head never comes down. His head stays exactly where it is the whole time. Presumably, and I understand this is speculation, but if he was attempting to get on the ground, you'd expect his feet to stop moving, you'd expect his body to be lowered. And frankly, the subjective intent of Mr. Craven is not relevant in this case. It's what a reasonable officer would have perceived. And I think any reasonable officer in this country, when they give an armed suspect a command to show his hands, and that suspect does show his hands and then reaches for a gun, I think any reasonable officer in this country would believe that that suspect intends to use the gun. And they would have probable cause to believe that they're about to face imminent harm of some sort. If there are no further questions, Your Honor, then I think we would rest on our briefs and our arguments. I'm happy to answer any further questions you all may have. Thank you, Mr. Stewart. Thank you. Mr. Hirory. Thank you, Your Honors. I'll go to, I think, Judge Rushing, your question about distinguishing the Ailman case. And I'm a little bit of a disadvantage. I think, Judge King, you wrote that opinion. But that case has a lot of similarities in that Judge King wrote that the video was inconsistent. It did not show clearly what happened. And so it was looking at the video, which did not support Officer Guerra's statement that he moved the gun and his left elbow to maybe point the gun and how he was holding it, point the gun at the officer. The video did not show that. And so the district court erred when it filled in the blank and credited Officer Guerra's testimony in that regard. And the court found that a jury could say they don't find Officer Guerra to be credible because the other things were inconsistent. One of the key facts in Ailman was that, as Judge Rushing indicated, the person there had his hands up in a position of surrender. That's not the case here. Well, again, yeah, and I believe- He was moving his hands in a downward direction. And Officer Guerra says that he's moving his left hand with the gun in it towards him, but the video does not show that. The video is unclear. But you agree he did not have his hands up in a position of surrender when he was shot? Correct, Your Honor. The other thing I'll note is that, you know, Chris had, if he had the weapon, it was in a holster here. And to pull a gun out of a holster, you'd have to go back. You'd have to raise your elbow up to pull it out of the holster. You can't get it like this. And so Chris's arms, when you never see them go towards his waistband, suggests that he can't get it out. He's not reaching for it. And I think that's critically important, and a jury ought to be able to decide, was that thought by Officers Arndt and Novelli, was that reasonable, or is it all make-believe, did they come up with it after the fact? And when Mr. Stewart was just arguing, he also noted that Chris's arms never moved back up. And that's really important because the officers say they saw it, that his hands moved up, yet it's belied by the evidence and their own counsel. So a jury could believe that the officer's testimony is self-serving and throw it out the window. And so then you're just left with the video, which doesn't show any aggression on Craven's behalf whatsoever. His head doesn't move at all. He doesn't make any threatening statements. In fact, to the contrary, if our evidences believe that he says you don't have to do this, he doesn't change his gait in a threatening manner. He doesn't twist his position towards any of the officer. He makes absolutely no threatening moves whatsoever, other than what the officers say happened, which a jury could disbelieve because they can find it not to be credible because they don't see it in the video and because they've contradicted themselves. Novelli, the night of, says, or in his SBI interview, he says he never saw, he couldn't see Craven raise his hands, but he could see a firearm. And that, to me, I think we can all agree, you can certainly see him put his hands up, but seeing the firearm is a much harder analysis. But Novelli says he can do those things. And the night of, he says he can't remember things. And then he later does remember things when he's asked. So I think a jury can find that those statements are not to be believed. And so then a jury is just looking at the video. And the video shows a man on his front porch who's been in a mental health crisis. Officers come shouting commands, inconsistent commands, and he doesn't make any threatening behavior, and they shoot and kill him 20 times in front of his own house in a matter of three seconds. There's three to four seconds. What were the inconsistent commands? Show me your hands, put your hands up, and get on the ground. The show me your hands and then get your hands up is a different officer who doesn't shoot at all. And so I think that's critically important, is that he's not disobeying any of the officers that fired shots. And then it's get on the ground. So it's all these rapid fire commands in a matter of three to four seconds to an individual they know is in a mental health crisis, which is important. They totally disregarded, they didn't have any training whatsoever, but they threw the policy that they had to sign off on and didn't get any training on. They threw that out the window when it says when a person is under a mental health crisis, you approach in a calm manner. Can I ask a quick question about the state law claims before you run out of time? Yes, Your Honor. The district court ruled that governmental immunity for the town had not been waived because there was a non-waiver provision in the insurance policy. Do you appeal that? I didn't see you contesting that, but I just wanted to make sure I understood it. Give me one second, Your Honor. Do you contest the non-waiver clause? No, we don't contest the non-waiver clause. You don't have to find a citation. I'm just asking, did you appeal the governmental immunity for the town? As to the non-waiver of the insurance? Insurance policy. Correct. We are not appealing that. Yes, Your Honor, I looked at this morning. There was actually something that Judge Bell said in that provision that I think we do contest, but it's more of a factual basis on what we've been talking about now versus the actual insurance policy argument. So unless the court has any other questions, I see my time has expired. Thank you very much, sir. We'll take the matter under advisement. We'll come down and greet counsel before we proceed to the next case.
judges: Robert B. King, Stephanie D. Thacker, Allison J. Rushing